### S98P1411. CROMARTIE v. THE STATE.
(514 SE2d 205)

HUNSTEIN, Justice.

Ray Jefferson Cromartie was convicted of malice murder, armed robbery, aggravated battery, aggravated assault, and four counts of possession of a firearm during the commission of a crime. The jury recommended a death sentence for the murder, finding the following statutory aggravating circumstances: the murder was committed while the defendant was engaged in the commission of an armed robbery; the murder was committed for the purpose of receiving money

or any other thing of monetary value; and the murder was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (4), (7). The trial court sentenced Cromartie to death. He appeals and we affirm.[1]

1. The evidence adduced at trial shows that Cromartie borrowed a .25 caliber pistol from his cousin Gary Young on April 7, 1994. At about 10:15 p.m. on April 7, Cromartie entered the Madison Street Deli in Thomasville and shot the clerk, Dan Wilson, in the face. Cromartie left after unsuccessfully trying to open the cash register. The tape from the store video camera, while too indistinct to conclusively identify Cromartie, captured a man fitting Cromartie's general description enter the store and walk behind the counter toward the area where the clerk was washing pans. There is the sound of a shot and the man leaves after trying to open the cash register. Wilson survived despite a severed carotid artery. The following day, Cromartie asked Gary Young and Carnell Cooksey if they saw the news. He told Young that he shot the clerk at the Madison Street Deli while he was in the back washing dishes. Cromartie also asked Cooksey if he was "down with the 187," which Cooksey testified meant robbery. Cromartie stated that there was a Junior Food Store with "one clerk in the store and they didn't have no camera."

In the early morning hours of April 10, 1994, Cromartie and Corey Clark asked Thaddeus Lucas if he would drive them to the store so they could steal beer. As they were driving, Cromartie directed Lucas to bypass the closest open store and drive to the Junior Food Store. He told Lucas to park on a nearby street and wait. When Cromartie and Clark entered the store, Cromartie shot clerk Richard Slysz twice in the head. The first shot which entered below Slysz's right eye would not have caused Slysz to immediately lose consciousness before he was hit by Cromartie's second shot directed at Slysz's left temple. Although Slysz died shortly thereafter, neither wound caused an immediate death. Cromartie and Clark then tried

---

[1] The crimes occurred on April 7 and April 10, 1994. Cromartie was indicted in Thomas County for malice murder, armed robbery, aggravated battery, aggravated assault, and four counts of possession of a firearm during the commission of a crime on October 20, 1994. On October 31, 1994, the State filed a notice of intent to seek the death penalty. The jury convicted Cromartie of all counts on September 26, 1997, and on October 1, 1997 sentenced Cromartie to death. After merging the aggravated assault and one count of possession of a firearm during the commission of a crime into the other convictions, the trial court sentenced Cromartie to death for the murder, life imprisonment for armed robbery, 20 years for aggravated battery, and five years for each remaining count of possession of a firearm during the commission of a crime, all sentences to be served consecutively. Cromartie's motion for new trial was filed on October 27, 1997 and denied on April 7, 1998. Cromartie filed a notice of appeal to this Court on May 7, 1998, and the case was docketed on May 28, 1998. The case was orally argued on September 16, 1998.

to open the cash register but were unsuccessful. Cromartie instead grabbed two 12-packs of Budweiser beer and the men fled. A convenience store clerk across the street heard the shots and observed two men fitting the general description of Cromartie and Clark run from the store; Cromartie was carrying the beer. While the men were fleeing one of the 12-packs broke open and spilled beer cans onto the ground. A passing motorist saw the two men run from the store and appear to drop something.

Cooksey testified that when Cromartie and his accomplices returned to the Cherokee Apartments they had a muddy case of Budweiser beer and Cromartie boasted about shooting the clerk twice. Plaster casts of shoe prints in the muddy field next to the spilled cans of beer were similar to the shoes Cromartie was wearing when he was arrested three days later. Cromartie's left thumb print was found on a torn piece of Budweiser 12-pack carton near the shoe prints. The police recovered the .25 caliber pistol that Cromartie had borrowed from Gary Young, and a firearms expert determined that this gun fired the bullets that wounded Wilson and killed Slysz. Cromartie's accomplices, Lucas and Clark, testified for the State at Cromartie's trial.

The evidence adduced was sufficient to enable a rational trier of fact to find Cromartie guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find the statutory aggravating circumstances which supported his death sentence for the murder. Id.; OCGA § 17-10-35 (c) (2).

2. Cromartie complains that the trial court should have granted his motion for a change of venue.

> A trial court must order a change of venue in a death penalty case when a defendant can make a "substantive showing of the likelihood of prejudice by reason of extensive publicity." To justify a change of venue, a defendant must show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of individual jurors.

(Citations omitted.) *Barnes v. State,* 269 Ga. 345, 347-348 (2) (496 SE2d 674) (1998). Cromartie can show neither an inherently prejudicial trial setting nor sufficient actual bias on the part of individual jurors. There were only a few articles in the local newspaper about the crimes, most of which were published when the crimes were committed, over three years before the trial. The media coverage was not extensive or inflammatory; it did not reflect an atmosphere of hostility sufficient to render the trial setting inherently prejudicial. See id.

As to the individual jurors, only 28 of 105 prospective jurors stated that they had read any articles about the case, and most of these jurors indicated that they had not formed a fixed opinion as to Cromartie's guilt or any other issue at trial. Only one prospective juror was excused for cause for having a fixed opinion due to pretrial publicity. The trial court did not err by denying Cromartie's motion for a change of venue. Id.

3. The trial court did not abuse its discretion in denying Cromartie's motion to sever the offenses at the Madison Street Deli from the offenses at the Junior Food Store. *Dennis v. State*, 263 Ga. 257, 259-260 (6) (430 SE2d 742) (1993). In this case, the two shootings were similar, occurred only three days apart, involved the same gun, and were part of a single scheme or plan to rob convenience-type stores.

4. There is no evidence that any cognizable group was underrepresented in the Thomas County grand jury pool. See *Bright v. State*, 265 Ga. 265, 283 (12) (455 SE2d 37) (1995); *Hicks v. State*, 256 Ga. 715, 718 (7) (352 SE2d 762) (1987).

5. The death qualification of prospective jurors is not unconstitutional. *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997); *McMichen v. State*, 265 Ga. 598, 611 (28) (458 SE2d 833) (1995).

6. OCGA § 17-10-30 is not unconstitutional. *McMichen*, supra, 265 Ga. at 611 (25).

7. The trial court did not err by excusing prospective juror Smith for cause due to her inability to consider a death sentence. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). Although she answered several questions equivocally, juror Smith also repeatedly and firmly stated that she could not vote to impose a death sentence under any circumstances. The trial court was authorized to excuse her for cause. *Greene v. State*, supra, 268 Ga. at 49.

8. Cromartie contends that the trial court improperly limited the scope of his voir dire on the issue of the death penalty. The scope of voir dire is left to the trial court's discretion, and the voir dire in this case was broad enough to ascertain the prospective jurors' views regarding capital punishment and the imposition of the death penalty. See *Barnes v. State*, supra, 269 Ga. at 351 (10). We find no error.

9. Cromartie complains that the trial court erred by failing to excuse several prospective jurors for cause due to their views on capital punishment, exposure to pretrial publicity, or other alleged bias. "Whether to strike a juror for cause lies within the sound discretion

of the trial court." *Brown v. State*, 268 Ga. 354, 356 (3) (490 SE2d 75) (1997).

(a) *Pretrial publicity.* The record reveals that the prospective jurors who had been exposed to pretrial publicity but were qualified to serve either had no opinion about the case or could lay aside their opinion and render a verdict based solely on the evidence and the trial court's instructions. A prospective juror is not required to be ignorant of the facts and issues involved in a case; "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U. S. 717, 722-723 (81 SC 1639, 6 LE2d 751) (1961). See also *Woodbury v. State*, 264 Ga. 31, 32 (2) (440 SE2d 461) (1994). We find that no prospective jurors were erroneously qualified to serve due to their exposure to pretrial publicity. Id.; *Brown*, supra, 268 Ga. at 356-357 (3).

(b) *Death penalty.* As previously stated, a prospective juror is not disqualified based upon his views on capital punishment unless "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Greene*, supra, 268 Ga. at 48, quoting *Wainwright*, 469 U. S. at 424 (II). "As a general proposition, a juror who merely 'leans' one way or the other before hearing any evidence is not disqualified." *Jarrell v. State*, 261 Ga. 880, 881 (1) (413 SE2d 710) (1992). Whether to strike a juror for cause due to bias regarding the death penalty is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion. *Greene*, supra, 268 Ga. at 50. Viewing the record as a whole, we conclude that the trial court did not abuse its discretion by refusing to strike prospective jurors who Cromartie claims were disqualified due to their views on capital punishment. Id. at 48-50.

(c) *Other alleged biases.* Cromartie claims that two prospective jurors should have been excused for cause due to their relationship with State witnesses and the prosecutors. One prospective juror is an accountant who prepared taxes for a State witness and was in the Kiwanis Club with a prosecutor. The accountant only saw the State witness about twice a year. The second prospective juror knew a State witness and a prosecutor because they attend the same church. While the second prospective juror said that she trusted the prosecutor that she knew, both prospective jurors stated that they could lay aside any acquaintanceship and determine the credibility of the witnesses and render a verdict based solely on the evidence presented at trial. The trial court did not abuse its discretion by denying the motions to strike these two prospective jurors for cause. *Brown*, supra, 268 Ga. at 356 (3).

Two other prospective jurors had business connections to the convenience store industry. Despite some equivocal responses, both

prospective jurors stated that they could lay aside their opinions regarding convenience store robberies and render a verdict based solely on the evidence. In addition, Cromartie asserts that one of these prospective jurors should have been excused because her company owns the convenience store across the street from the Junior Food Store and a State witness (the convenience store clerk who saw Cromartie and Clark run from the Junior Food Store) had worked there. However, the prospective juror did not know the State witness and did not recognize his name on the witness list. She also stated that his employment in her company would have no effect on her decisions in the case. The trial court did not err by refusing to strike these prospective jurors for cause. Id.

10. The record shows that the trial court did not impermissibly limit the scope of Cromartie's voir dire examination of prospective jurors with regard to racial bias or pretrial publicity. Cromartie was permitted to tell jurors the race of the accused and the victims, and to question the prospective jurors about racial prejudice, including questions such as whether they belonged to groups or clubs that excluded people for racial reasons, or if they had friends or co-workers who were African-American. Cromartie was also allowed to ask prospective jurors if they had heard or read anything about the case, and if such publicity caused them to form an opinion. "The scope of voir dire is largely left to the trial court's discretion, and the voir dire in this case was broad enough to ascertain the fairness and impartiality of the prospective jurors." *Barnes,* supra, 269 Ga. at 351-352 (10).

11. Cromartie complains that several jurors were improperly excused due to their religious opposition to the death penalty, and that a strike on this basis violates the constitutional right of religious freedom. This contention is without merit. As stated in Division 5, the death qualification of prospective jurors is not unconstitutional. *DeYoung,* supra, 268 Ga. at 790 (11). The standard for excusing a prospective juror based upon the prospective juror's views on the death penalty draws no religious or secular distinction. See *Wainwright,* supra, 469 U. S. at 424 (II); *Greene,* supra, 268 Ga. at 48. Upon review of the record, we conclude that the trial court did not erroneously strike any prospective juror who was biased against the death penalty. Id.

12. The record shows that the State did not violate *Brady v. Maryland,* 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), or *Giglio v. United States,* 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972). The trial court did not err in denying Cromartie's motion to discover the personnel files of the police officers who investigated his case and the presentence investigation reports of his accomplices absent a specific showing of need. OCGA § 42-8-40. See *Cargill v. State,* 255 Ga. 616,

638 (23) (a) (340 SE2d 891) (1986); *Mills v. State*, 244 Ga. 186, fn. 1 (259 SE2d 445) (1979).

13. The trial court did not abuse its discretion in denying Cromartie funds to hire a forensic pathologist and a ballistics expert. *Thomason v. State*, 268 Ga. 298, 310-311 (7) (486 SE2d 861) (1997); *McMichen*, supra, 265 Ga. at 603-604 (3).

14. The trial court did not err in finding probable cause sufficient to authorize Cromartie's warrantless arrest. OCGA § 17-4-20 (a); *Durden v. State*, 250 Ga. 325, 326-327 (1) (297 SE2d 237) (1982). Contrary to Cromartie's contention, there is no evidence that he was arrested inside his home. See *Mincey v. State*, 251 Ga. 255, 261 (6) (a) (304 SE2d 882) (1983). After his arrest, the warrantless seizure of the shoes Cromartie was wearing, which were later found to be consistent with the shoe prints at the Junior Food Store, was legal. *Batton v. State*, 260 Ga. 127, 130 (3) (391 SE2d 914) (1990) (warrantless seizure of shoes worn by defendant when arrested is proper as a search incident to arrest).

15. The trial court did not abuse its discretion in admitting, after a proper foundation had been laid, the 20-minute portion of the Madison Street Deli surveillance video that depicted the assailant entering the store, the sound of the shot, the assailant's attempt to open the cash register, and the arrival of law enforcement. OCGA § 24-4-48; *Woods v. State*, 210 Ga. App. 172, 174 (2) (435 SE2d 464) (1993) (admissibility of videotape addresses itself to the discretion of the trial court).

Nor did the trial court err in denying Cromartie's request to show the entire videotape. Cromartie argued that the entire two-hour videotape was relevant because it shows a customer who might resemble his cousin, Gary Young (the man who supplied Cromartie with the murder weapon), enter the store prior to the shooting and also shows unidentified people entering and leaving the store who could have been "scouting" for the shooter. The trial court allowed Cromartie to play for the jury that portion of the videotape showing a customer who may look like Gary Young and stated that it would admit other portions of the videotape if Cromartie identified the specific portions believed to be relevant. Cromartie refused to identify other portions of the videotape he believed to be relevant and instead insisted that the entire videotape be shown. We conclude the trial court did not abuse its discretion in denying the motion to show the entire videotape in that Cromartie failed to show how an hour-and-forty-minute depiction of customers shopping at the store was relevant. See *Alexander v. State*, 239 Ga. 108, 110 (1) (236 SE2d 83) (1977) (admission of evidence is a matter which rests largely within the sound discretion of the trial court).

16. There is no error in the admission of crime scene photo-

graphs or pre-autopsy photographs of the murder victim. *Bright v. State*, supra, 265 Ga. at 284 (16); *Osborne v. State*, 263 Ga. 214, 215 (2) (430 SE2d 576) (1993).

17. Cromartie moved to exclude the testimony of Gary Young, Corey Clark and Carnell Cooksey as the inherently unreliable testimony of an accomplice or informant. The trial court properly denied this motion. "The credibility of a witness is a matter to be determined by the jury under proper instructions from the court." OCGA § 24-9-80. In addition, there was evidence of Cromartie's guilt sufficient to corroborate the testimony of his accomplices. OCGA § 24-4-8; *Pye v. State*, 269 Ga. 779, 783 (5) (505 SE2d 4) (1998).

18. Cromartie contends that the trial court erred in denying his motion to suppress plaster cast shoe print evidence, claiming that the comparison of shoes with plaster casts of shoe prints cannot be verified with sufficient scientific certainty to make it admissible in court under the standards set forth in *Harper v. State*, 249 Ga. 519, 523-526 (1) (292 SE2d 389) (1982). In *Belton v. State*, 270 Ga. 671 (512 SE2d 614) (1999), we held with regard to this very issue that the standards of admissibility relating to scientific principles or techniques set forth in *Harper* are not applicable to shoe print identification because "the comparison of shoe prints to the external physical characteristics of particular shoes is not a matter of scientific principle or technique." Moreover, we note that shoe print comparison evidence has been widely admitted for many years in the courts of this State. See, e.g., *Baty v. State*, 257 Ga. 371 (359 SE2d 655) (1987); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Rhodes v. State*, 221 Ga. App. 792 (470 SE2d 790) (1996); *Hickey v. State*, 202 Ga. App. 636 (415 SE2d 60) (1992); *Kirby v. State*, 174 Ga. App. 58 (329 SE2d 228) (1985); *Hall v. State*, 155 Ga. App. 211 (270 SE2d 377) (1980). Accordingly, this enumeration lacks merit.

19. The trial court's instructions in the guilt-innocence phase were not improper for any of the reasons asserted by Cromartie.

(a) Cromartie's challenge to the failure of the trial court to charge the jury on felony murder as a lesser-included offense of malice murder, where Cromartie was not indicted for felony murder, is controlled adversely to him by *Henry v. State*, 265 Ga. 732 (6) (462 SE2d 737) (1995). In *Henry* we held that although the defendant was indicted for armed robbery and kidnapping with bodily injury along with malice murder, since reference was not made to these separate counts in the malice murder count, no charge on felony murder was required. We concluded that because the evidence in the case independently established the offense of malice murder, without the evidence necessary to prove the armed robbery or the kidnapping, felony murder was not, as a matter of fact, a lesser included offense of malice murder mandating a separate felony murder charge. Id. As in

*Henry*, Cromartie was indicted solely for malice murder, not felony murder. Compare OCGA § 16-5-1 (a) to OCGA § 16-5-1 (c). In separate counts, Cromartie was also indicted for armed robbery and possession of a firearm during the commission of a crime (two counts).[2] Because the malice murder count did not allege that the murder was committed while engaged in an armed robbery and "because the offense of felony murder would have required the proof of at least one additional fact beyond that required to establish malice murder," *Henry*, supra, 265 Ga. at 737, it was not error for the trial court to refuse to charge on felony murder. As we have noted in Division 1, the evidence that Cromartie's finger and shoe prints were found at the murder scene, that Cromartie had borrowed the murder weapon before the crime, that the murder victim was shot twice in the head at close range, and that Cromartie had boasted about shooting Slysz was sufficient to establish malice murder independent of evidence necessary to establish any other charged felony. Id.

Furthermore, assuming arguendo that felony murder was a lesser-included offense of malice murder in this case, we conclude that Cromartie can show no harm resulting from this ruling. Considering the evidence adduced, a felony murder conviction of Cromartie would not preclude the imposition of the death penalty. See *Tison v. Arizona*, 481 U. S. 137 (107 SC 1676, 95 LE2d 127) (1987); *Jefferson v. State*, 256 Ga. 821, 829 (353 SE2d 468) (1987).

(b) The trial court's charge on determining the credibility of witnesses was not error. *Brown v. State*, 264 Ga. 48, 50 (3) (c) (441 SE2d 235) (1994).

(c) The trial court's charge on the definition of reasonable doubt, which has been previously approved by this Court, did not erroneously diminish the State's burden of proof. *Johnson v. Zant*, 249 Ga. 812, 818 (9) (295 SE2d 63) (1982).

20. During the guilt-innocence phase deliberations, the jury separately requested to view the portions of the Madison Street Deli videotape depicting the circumstances of the shooting and the slow motion videotape of the same portion of videotape. Both videotapes had been admitted into evidence at trial. The trial court permitted the jury to view these videotapes again and, after viewing the slow motion videotape, reminded the jury that they must consider all of the evidence presented at trial. It is within a trial court's discretion to permit the jury at its instigation to rehear evidence after deliberations begin, *McMichen v. State*, supra, 265 Ga. 610 at (22), and we find no abuse of discretion in this case.

---

[2] The remaining counts of the indictment arose out of the shooting of Wilson at the Madison Street Deli on April 7.

21. During deliberations in the sentencing phase, the jury sent a note to the trial court asking, "As jurors, we would like to know what happens if we do not come up with a unanimous vote?" The jury had been deliberating less than three hours when this question was asked and there was no indication that the jury was deadlocked. The trial court responded that it could not answer that question and that the jury should continue its deliberations and try to reach a unanimous verdict. This response was not error. See *Romine v. State*, 256 Ga. 521 (1) (b) (350 SE2d 446) (1986) (jury not charged on the consequences of its failure to reach a verdict).

22. The trial court was not required to re-define reasonable doubt in the sentencing phase jury charge since Cromartie's jury had already been instructed on the definition of reasonable doubt in the guilt-innocence phase. *Bennett v. State*, 262 Ga. 149, 153 (10) (f) (414 SE2d 218) (1992). In addition, the trial court is not required to identify specific mitigating circumstances in its charge or to instruct the jury on a burden of proof for non-statutory aggravating circumstances. Id. at 153 (10) (d); *Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985). Cromartie's remaining contentions regarding the sentencing phase jury charge are also without merit.

23. Cromartie, an African-American, claims that the death penalty was sought and imposed in a racially discriminatory manner. In *Crowe v. State*, 265 Ga. 582, 595 (24) (458 SE2d 799) (1995), we recognized that a district attorney's discretion to seek the death penalty is not unfettered as it requires the exercise of professional judgment. Here, Cromartie fails to show that racial considerations played a part in the decision to seek the death penalty against him or that the decision-makers in his case acted with a discriminatory purpose. See *Rower v. State*, 264 Ga. 323 (1) (443 SE2d 839) (1994).

24. Cromartie claims that a juror changed her vote to a death sentence after consulting the Bible and that she looked up the word "malice" in a dictionary.[3] At the hearing on Cromartie's motion for new trial, the juror in question testified that she reads the Bible every day as a personal matter and denied that her Bible reading had anything to do with Cromartie's case or her sentencing decision. She also denied looking up anything in a dictionary during her jury service. She and the five other jurors who testified at the hearing stated that no Bible or dictionary was brought into the jury room and that the Bible did not enter into their deliberations. The only contradictory evidence came from a defense investigator who claimed that the juror in question had admitted to him that she read Bible passages and looked up "malice" in the dictionary. We hold the trial

---

[3] At Cromartie's request, the jury was not sequestered.

court did not abuse its discretion in crediting the testimony of the jurors and in concluding that the jury based its sentencing decision solely on the evidence and the trial court's instructions. *Young v. State,* 269 Ga. 490 (2) (500 SE2d 583) (1998) (denial of motion for new trial upheld absent an abuse of discretion); *White v. State,* 221 Ga. App. 860, 862 (2) (473 SE2d 539) (1996) (trial court's findings of fact on motion for new trial affirmed unless clearly erroneous). Furthermore, a juror's personal use of the Bible or other religious book outside the jury room is not automatically prohibited. See *Jones v. Kemp,* 706 FSupp. 1534, 1560 (N.D. Ga. 1989).

25. "The trial court did not err in declining to make the jurors' handwritten notes a part of the record on appeal." *McMichen v. State,* supra, 265 Ga. at 613 (35).

26. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, as all involve a deliberate killing during the commission of an armed robbery.

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs in the judgment only as to Division 19 (a).*

APPENDIX.

*Bishop v. State,* 268 Ga. 286 (486 SE2d 887) (1997); *Jones v. State,* 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State,* 267 Ga. 547 (480 SE2d 583) (1997); *McClain v. State,* 267 Ga. 378 (477 SE2d 814) (1996); *Crowe v. State,* 265 Ga. 582 (458 SE2d 799) (1995); *Christenson v. State,* 262 Ga. 638 (423 SE2d 252) (1992); *Meders v. State,* 261 Ga. 806 (411 SE2d 491) (1992); *Ferrell v. State,* 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State,* 261 Ga. 1 (401 SE2d 500) (1991); *Romine v. State,* 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State,* 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State,* 253 Ga. 622 (323 SE2d 801) (1984).

DECIDED MARCH 8, 1999 —
RECONSIDERATION DENIED APRIL 2, 1999.

*Michael Mears,* for appellant.
*J. David Miller, District Attorney, James E. Hardy, Mark E. Mitchell, Assistant District Attorneys, Thurbert E. Baker, Attorney*

*General, Susan V. Boleyn, Senior Assistant Attorney General, Christopher L. Phillips, Assistant Attorney General,* for appellee.